Our next case for argument today is in the matter of the Stericycle Securities litigation. That seems to have done it. Okay, I apologize. Mr. Petri appeals an $11 million fee based on what was claimed to be $4 million of Lodestar before the motion to dismiss was decided, less than 1% of damages, alleged damages recovered. Now, the Synthroid case requires a district court to emulate a market rate, what a sophisticated and unconflicted client would agree to. The court erred as a matter of law when it failed to do that. It ignored the first benchmark, actual agreements, which here show sophisticated clients negotiate rates a fraction as high as what is charged here, even with this particular law firm. It instead erred by applying a four-factor test divorced from Synthroid. And even there, it erred in applying this four-factor test by misreading the precedents in the district courts that it relied upon. Now, Mr. Frank, could I ask you to address specifically the fee structure in the Mississippi Retirement System program in the, it's in your appendix pages, and A148 is the schedule. You discussed it in your brief. That, and that table worked out, I would work out to a little more than half of the amount awarded here. You see where I'm, where I'm? Yes, your honor. That's the New York funds. That's not a mis, that's not this particular plaintiff. A148? Oh, you're right, your honor. I'm sorry, I was looking at A142, but A148, it does show a different recovery than what the court awarded here. But in terms of, if we're looking as we usually try to for ex ante negotiations of fees, this is, this lead plaintiff and class counsel is on the panel of approved law firms, correct? Yes, your honor. Why isn't that, why doesn't that make this a pretty, and Mr. Brown, I'll ask you the same question, but why doesn't this wind up making this a pretty easy case? Well, the pay to play arrangements would mean that what is agreed upon is likely to be exaggerated. If we were to impose, I understand that, but if we were, and, but if we were to simply say, exhibit B here is a pretty good, in fact, compelling piece of evidence about what a reasonable fee would be under these circumstances, we wouldn't even need to worry too much about the pay to play and the fee would be cut by a little less than half. That's correct, your honor. Okay. Uh, also address Mr. Frank, the, um, the nearest study that, uh, class counsel relies upon, which seems to show, uh, 25% of, uh, of a settlement fund in this range, looking pretty reasonable among the general population of settlements. Certainly that's what, uh, courts impose ex post, uh, but that's the full range of settlements. Those are, that, that includes every settlement that's been negotiated, uh, af, you know, af, after summary judgment proceedings, uh, on the eve of trial. Uh, it, the, the numbers they use don't distinguish between cases, uh, and, and as we showed, uh, sophisticated clients rely upon, uh, at the stage of the litigation because that affects the level of risk. There's substantially less risk before a motion to dismiss is decided, uh, versus after class certification motions, after summary judgment motions and, and sophisticated clients agree to those arrangements and, and courts generally, uh, recognize those things. But, uh, we, we would say don't go with the NERA in part because most of the cases they're using there are not using the seven circuits market emulation techniques and include lots of cases where the fees are dramatically exaggerated in part because of pay-to-play arrangements. Uh, and, and investigation of pay-to-play arrangements in State Street uncovered extraordinary multi-million dollar referral fees. Uh, the district court erred in holding that there is no evidence supporting such arrangements here when the Mednex case used less evidence than what Petrie presented here, uh, to disqualify Ms. in discovery. Uh, and the district court erred in refusing discovery by claiming it would cause delay when the modest discovery requests that, uh, Petrie, uh, asked for, uh, could have been resolved had the court simply ruled upon it when Petrie made the motion instead of waiting seven months to rule on the motion. And that sort of bootstrapping this court has held, uh, is inappropriate in terms of arguing that, uh, delay precludes, uh, granting timely requested relief. Uh, sophisticated clients, uh, such as New York funds, Chicago teachers union, uh, agree to rates substantially lower than the 25% requested here. Uh, we think discovery would have been very interesting because, uh, plaintiffs never deny the existence of other fee-splitting, fee-sharing agreements. Uh, they merely state that there are no other fee-sharing agreements in the record, and that's because, well, we didn't get discovery on the fee-sharing agreements. Uh, we think it's entirely possible that the fee-sharing agreements here that were in place, uh, before we came in and objected, uh, were similar to the ones in State Street where, uh, the local firms were getting 20% of the total fee for, for next to no work or no work at all. And, uh, if, if that had been exposed, uh, that alone would have justified a lower rate because it would have shown that Bernstein-Litowitz was willing to agree to a, a substantially lower rate, uh, on its own, uh, in exchange for, uh, it, it, and, and, and that the 25% it was asking for was meant to recover, uh, these referral fees. Um, I, I look forward to your questions on these issues, uh, and otherwise I'll reserve the remainder of my time for rebuttal. Certainly, Mr. Frank. Mr. Brown. May it please the court. Good morning, Mr. Brown. Mr. Brown, you are a completely black box. Oh, I'm so sorry, your honor. You're very well lit from behind. So there's essentially, the camera does not see your face. I tested this with the court officers and we all thought it was kind of okay. And maybe the sun has changed. Is that better? No. Um, let me try one more thing, your honor. Can I turn this around and see if I turn it away from the window? It helps before argument begins. Yeah, I know your honors. And, and we actually did and it looked okay, but I guess it was earlier this morning. Is that better at all? Yes, we can now see you. Okay. Thank you very much. And I apologize for that. Um, may it please the court, your honor, John Brown, I want to, um, you know, uh, respond immediately to, uh, to judge Hamilton's first question, um, about the Mississippi, uh, fee agreement and the interpretation of that, because while it's a, it's a reasonable question, um, it is incorrect, um, to interpret the fee agreement that way. And if you look at the, and it's never been interpreted that way, and it's interpreted by the Mississippi attorney general, according to the plain terms of the fee agreement. And if you look at the exhibit B, which is on appendix a one 48 in you at the very bottom of that, it says in this schedule, the quote recovery refers to the estimated recovery that mispers is awarded as its share of the recovery achieved for the class. So in this case, mispers. So your theory is that that, so that, so that we should look only at what mispers would recover, right? Yeah. It's not just a theory, your honor. It's actually the interpretation of the attorney general of Mississippi and any other cases that Mr. I'm sorry, Mr. Mr. Brown, let me ask you about this. I assume that Miss purse has fiduciary duties to, um, this is a reasonable fee schedule in protecting the interests of its, um, uh, beneficiaries and members and allocating risks and benefits, right? It does your honor. Yes. Okay. And in this case, mispers is acting as a fiduciary, um, in addition for all of the class members, correct? Correct. So why is this not then a reasonable gauge of this fiduciaries effort to protect the interests of those to whom it owes those obligations? Because your honor, this is a fee agreement. That's not a private agreement in a single case between Mississippi. It's a fee agreement where Mississippi is also the fiduciary to a class and a fee agreement here where the 25 applies up to by mispers up to $10 million. Once you get out of that range, the class recovery would be much, much larger. Um, if mispers is recovering more than $10 million, the class recovery necessarily would be much larger. And the fee agreement would then go down based on sort of this mega fund principle of larger recoveries, um, for, for the class as a whole. Now, in a case like this, your honor, almost any, almost any case, um, you know, any class action where the recovery is less than $10 million for mispers is probably going to be a larger recovery for the rest of the class. And the attorney's fees, um, would, could go down if that recovery is so large that mispers itself is recovering $10 million. So it's not apples to apples comparison. It's to answer your question directly. I hope the fee agreement here is not to cover just for mispers mispers also has a fiduciary duty to the entire class. That duty includes to enter into an appropriate fee agreement that incentivizes lead counsel to achieve large recoveries for the class. The schedule is very clear, um, that it says that the recovery refers to the estimated recovery that mispers, not even Frank made this argument on appeal. There are multiple, I would say, dozens of securities class actions with my firm and others where this fee agreement has applied, um, the same schedule and it has never been interpreted by Mississippi, um, in the way that you can, you can on a quick reading of it, you know, uh, come to that conclusion. Um, more than that, the, the, the, if it's read that way, um, to apply to the whole class, which I think it can't be on his plain terms and which I know it can't be pursuant to interpretations of attorneys general of the state of Mississippi, um, who have interpreted this way and this is the way they met it. Um, and this, the, we've noted in the record approved the fee. So that would be my answer to that. Your honor. It's, it's just not the plain terms of the agreement. It's not an agreement just between Mississippi and the non-class case. It's an agreement with, um, you know, that applies to the benefit of the entire class. So, um, moving on your honor, I do want to, I do want to just say that, um, you know, this is, this is obviously an appeal, um, under an abusive discretion standard, um, that claims that the district court abused its discretion when it awarded as your, as your honor noted, um, the precise median fee, um, that Nero, which is a well-known, um, top of the line economic consulting organization noted in all the securities class actions that settled between 2014 and 2018, um, the median fee in between 25 million and $100 million. And the median fee was 25%. It's precisely, um, what the district court, uh, ordered here. And I will point as well that the fee request was submitted pursuant to two lead plaintiffs, two, two institutional lead plaintiffs. Um, Arkansas teachers was another one, which also approved it. Um, there were 300,000 class notices that went out. Uh, there were, there was only one objection request. This is judge Easterbrook. Do you have any response to professor choice article, uh, on pay to play in securities class action? Uh, Petrie cited that has relied on it repeatedly in his briefs. You rely on the nearest study. Uh, Petrie has relied on professor choice study. Uh, but I haven't seen any discussion of that in your briefs and the district court didn't mention it. Uh, I think this is something you may want to discuss. Uh, yes, judge Easterbrook. I will. Um, the choice study sort of assumes the conclusion. First of all, it is, it assumes the predicate, which hasn't been established here and is only speculation. And in fact, which the district court rejected that there's a pay to play arrangement. Mr. Brown, I would like you to discuss the choice study rather than your arguments about this case. I'm sure what Mr. Petrie would reply. In fact, what is brief did say is that it's very hard to establish a pay to play relation with certainty when the district court doesn't let you take any discovery. But my invitation to you is that this is your opportunity to discuss the joy article rather than something else. Okay. Um, judge, I appreciate that. I mean, the joy argument says the joy article says what it says. Um, but in, but what the, what, what is missing from applying the Troy article to the facts of this case are that there's a whole second last time. Okay. I'm inviting you, I'm giving you an opportunity, a final opportunity to discuss the Troy article. If you want to discuss the facts of this case, that's fine. But that means that you will have bypassed for a final time, any opportunity to discuss professor choice, empirical study. Okay. Your honor. All I will say about the empirical study is that, um, according to professor Troy, it, it, it studied an isolated group of cases and made the determination that I think that is accurately described in there. My real response, there's, that's a study. Um, we have the nearest study, which, um, uh, is also out there in the record. So that is in the substance of the science of the professor Troy article. I don't have anything to remark upon that in the application of that article to this case, I would say that it's completely inapplicable for multiple reasons. Um, first, as I said, there's, it assumes the predicate. Okay. Um, even if it's true, the, the, the professor article, Troy article doesn't apply here because it assumes the predicate, which hasn't been established and it can't be established here because in this case, and this is a big hole in the appellate's argument, particularly when trying to say the district court abused its discretion. Um, the only political contributions, which are public by the way, that are alleged to have been made are to the Mississippi lead plaintiff. There is an entire separate lead plaintiff here, institutional investor, Arkansas teachers, and not a sink. There's not a single allegation that any political contribution was made, um, to that institutional investor, that institutional investor also approved the fee. So I'm sorry, if you wanted me to discuss the science of the Troy argument, but my response to it really, um, judge you specifically would not be to the teacher's retirement system, but rather to candidates who exercise political power over that, right? That's that's correct. So, okay. Um, all right. That's a good response. The record. Oh, I'm sorry. Were you about to ask a question? No, I'd actually, if judge Easterbrook wants to follow up, I'll, I'll, I'll wait. No, I'm, I'm done on this subject. Okay. Well, I wanted to ask you, Mr. Brown about your response to the motion for sanctions, um, in which you tell us that your ad hominem attacks on Mr. Frank are irrelevant. And when I look at your statement of issues in the appeal, um, you use the phrase, no Terry, notorious professional objector in your restatement of issue. Number two, how is it irrelevant? Um, if you're, if you're bringing it up, well, my re my response, uh, respectfully, um, uh, judge Hamilton was that it was supported by, um, publicly reported decisions of other district courts, um, that he's, that he's been, um, accused as a professional objector and a serial objector. That's just a matter of public record. Um, we devoted half of it. Why does that matter? Well, it may or may not matter. That's a fair question. Um, we, I'm glad you think my questions are fair, Mr. Brown. I'm sorry. I'll assume all your questions are fair. It may or may not matter. We, we, we believe that the appeal lacks merit. It completely fails to show that the court on this record abused its discretion. And we, we oppose the objection and the appeal on the merits of it. That being said, for instance, your Honor, look at it, think of it a different way. Let's say there were 50 objectors here who owned 30% of the stock. Um, or conversely, if there were two very, very large institutional investors like PIMCO or BlackRock who were here before the court objecting, the court might consider that who the objectors were. Other courts have done so. It is not required. It is not determinative. It is just a short data point, um, that is before the court, um, that may or may not be considered. It is not. Another, another data point would be Mr. Frank's rather extraordinary track record of success, uh, in this court in objections to class council fee arrangements that are far too cozy. I agree with that, your Honor. I, but if you look at all of those cases that Mr. Frank has had success on there, they, they involve either coupon cases or they involve cases where there was a very small common fund and this, and for instance, in one of them, there was an $800,000 common fund. The attorneys recovered $2 million and a third party, um, was assigned $1 million or $1 million. It's just not like the case here. This is a common fund case where we requested and the court approved and all but one class member agreed that the exact median fee in these types of cases, um, should be awarded. And I should say, your Honor, in defense of the district court, the district court didn't just rubber stamp our fee request. Um, judge would actually fly spec it and Sue a spotty on her own reduced some of the expenses that we asked for. And she did agree with one argument that Mr. Frank made where the, um, notice of administration costs had to be taking out, taken out of the fee, uh, to net, uh, to net before, um, before the fee was calculated. I do want to make, um, I do want to make one point about the state street lawsuit, um, that was referenced at the outset. It's completely irrelevant here. That state street lawsuit didn't involve my law firm. First of all, second of all, the issue there was that there was an undisclosed payment to an attorney, um, that the court never knew about, um, in Arkansas. The record is undisputed here. There are no undisclosed payments to anyone. Every single payment to the penny has been explained to the district court where it's going, the methodology behind why it's, why it was done. So in the ground, where do we find the current, um, the version of your agreement, fee agreement with your clients? Well, I believe the, uh, it exhibit a 40, the exhibit a 43 is the one for Mississippi, your honor. Okay. And was there, were there prior versions of that? No, not for this case. This is the agreement. Um, so, um, you know, so, so that's, that's the agreement, right? No, your honor. I was referring to the retention agreement. I thought that's what you're asking about. It was what I was asking about. You, you referred to a 43. I totally misspoke. I meant a one 48, the same document that your honor began the questioning with. Okay. Uh, and were there any earlier versions of that relevant for this case? Not, not that I'm aware of it. I absolutely believe not. No, I, the answer is the answer is no. I, you know, this is the governing governing agreement. Um, like I said, it's not interpreted and it hasn't been by Mississippi in that way, nor do I think an interpretation of it that way would be consistent with, with the market, your honor. Um, a much more accurate interpretation of market rates is a study of the entire market that we put forth in Nira and imposing an incorrect interpretation of this actually not be my, I'm sorry, I'm out of time. Time is expired. Mr. Frank, anything further? Yes, your honor. Um, I, I want to correct, uh, I, I think a misunderstanding of judge Hamilton. Uh, we're requesting fee sharing agreements. Uh, what's at a one 48 is the retention agreement between Ms. Purse and, uh, Bernstein Littowitz and Brown. Are there any other earlier versions of those? Well, your honor, we've disclosed the fee sharing to the court. Were there earlier versions, earlier versions of what your honor? He's sharing agreements, but we're just talking about, uh, there are no fee sharing agreements in the record. There's a, there's a disclosure of what the feature. I'm sorry, your honor. Do earlier versions exist? Uh, your honor, I'm, I'm There was a disclosure of the, of the arrangement, um, and, and, and the payments to the, to the other attorneys. Thank you. You're welcome. Um, that's exactly the sort of dance we discussed in our reply brief. They say that there are no fee sharing agreements in the record. And even now, and, and, and you can review the tape. He does not say there are no fee sharing agreements that existed before we requested the fee sharing agreement. He says, I heard the answer. Thank you. Um, I want to address NERA again. Uh, the universe of cases I think in NERA is different than, I, I think the critical question is this type of case. And, and Mr. Brown says, uh, discuss is the average for this type of case. And we would dispute that this is this type of case. The NERA is looking at every single securities case in every single circuit, whether or not they use, uh, a, a market emulation or not. Uh, and as we showed, uh, cases such as this that are resolved before the motion to dismiss is decided, get a much lower rate in, in a market arrangement. And NERA does nothing to distinguish between those types of cases and, uh, other cases that are fully litigated, uh, that involve discovery. And this is a PSLRA case. There's no discovery until the motion to dismiss is decided. Uh, Private Securities Litigation Reform Act don't mean to, uh, use an acronym there. Uh, with, with, with these issues, you're going to see a lower rate. And indeed we do. When you have sophisticated clients, such as Chicago Teachers Union, which retains Bernstein-Litowitz and pays them much less, uh, even for a case that's further advanced than this, or New York Funds, which, uh, seeks, uh, which negotiate an 8% rate for a case resolved before the motion to dismiss was decided. Mr. Frank, could I ask you to, um, go back to the, the MISPRS schedule? Um, and Mr. Brown has told us, no, that doesn't apply here. That applies only if, that applies only to MISPRS share of any class recovery. In your experience, would it be unusual to see a lead plaintiff with as much as 1% of the loss in a publicly traded, uh, securities fraud case? Uh, I think that would be very unusual to, to, to have, uh, uh, a lead plaintiff as much as 1% of the loss. So, but I, I agree with, uh, Mr. Brown's interpretation of that agreement, but I, I, I think it's, uh, it, it shows the degree to which MISPRS is not, uh, being a faithful fiduciary to the class and negotiating that sort of agreement. If that's right, but if, if, if that, for example, that would mean if, let's say it had 1% of the, um, of the losses and up to, and got $10 million. That would be a $1 billion settlement fund. Uh, and the agreement would provide for 25% of that in fees, correct? That's correct, Your Honor. Is that, is that consistent with the NERA data? Uh, that's not even consistent with the NERA data, which, which shows, I believe, uh, a, a, a monotonically declining, uh, fee rate for, uh, larger settlements. Thank you. Uh, if, if there are no further questions, uh, I, I, I, I think the Court understands our briefing. Uh, this is a substantially different case than Motorola. Uh, contrary to plaintiff's representation, there were multiple plaintiffs' firms willing to take this case, uh, DACA 25. Uh, and, uh, I, I, I think the dicta in Motorola about, uh, sophisticated investors... I'm sorry? I, I, I thought there was a question coming. Uh, the dicta in Motorola about sophisticated investors, you, you cannot expect a sophisticated investor to object. Uh, no sophisticated investor is going to have more than, uh, 50 to $100,000 of, uh, fees at stake, and they can't hope to perform the investigation. Even if, if they're knowledgeable about these issues, uh, they, they can't hope to perform the speculative investigation, uh, into the attorney's fees, which might not prevail in the district court. And even if it does prevail, uh, we won $46 million for, uh, shareholders in, uh, Southern District of New York case, and the Court awarded us $33,000 in fees. And so, you know, we're a non-profit, we're okay with that, but you, you're not going to find for-profit, uh, institutional investors engaging in, in that sort of, uh, money-losing operation for the common good of shareholders. Uh, I welcome any other questions, and if not, I'll, I'll submit on the briefs. Thank you very much, Mr. Frank. The case is taken.